UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

TJS OF NEW YORK, INC., a New York Corp.                03CV4407 (SJF) (ARL)

Plaintiff,

-against-

TOWN OF SMITHTOWN, a New York
Municipal Corporation,

Defendant.

------------------------------------------------------------------X

FEUERSTEIN, J.

I.      Facts and Procedural History

The Town of Smithtown ("Town" or "Defendant") occupies approximately fifty-five (55) square miles in Suffolk County and has a population of approximately one hundred fifteen thousand (115,000). (Joint Pre-Trial Order, Stipulation 3). Jericho Turnpike, a main thoroughfare also known as Route 25, borders the Nissequogue River.

490 West Jericho Turnpike, Smithtown, New York has been operating as an adult entertainment establishment since approximately 1979 under various names and owners. (Comp. CV 993731 ¶ 36). The site is one-third (1/3) of an acre (Tr. 778) and the square footage of the adult use is sixteen hundred (1,600) square feet (Tr. p. 779). The subject property is within five hundred (500) feet of three (3) parks, one of which is the location of the Town's symbol "Whisper the Bull."

-1-

In September 1994 the Town enacted an adult use ordinance which limited adult entertainment uses to three zoning districts: shopping center business ("SCB"), light industry ("LI") and heavy industrial ("HI"). The 1994 ordinance set forth an amortization schedule eliminating adult entertainment uses after January 1, 1998 in all zones other than SCB, LI and HI zones. Nevertheless, the adult entertainment use at 490 West Jericho Turnpike, which is in a Neighborhood Business (NB) Zone, continued.

In December 1998 the building located at 490 West Jericho Turnpike was damaged by fire.

In July 1999, 490 Habitat, Inc., a previous owner of the business now owned and operated by Plaintiff, filed suit in this Court to challenge the 1994 ordinance. (490 Habitat, Inc. v. Town of Smithtown, No. CV-99-3731). 490 Habitat claimed, *inter alia*, that the 1994 ordinance was an unlawful restriction on free speech because it did not provide a reasonable number of locations for "new adult entertainment businesses to open and operate in Smithtown," and because the special exception requirement which was in the 1994 ordinance was an unconstitutional prior restraint on activities that are protected by the First Amendment. (Comp. CV-99-3731).

As amended on May 30, 2000, the Town of Smithtown Code Section 322-30.2 states in pertinent part:

Adult retail shop or adult entertainment. The following apply to an adult retail shop or adult entertainment:

A. The building shall be at least 500 feet from any residence district, park, playground, school, church or

-2-

similar place of public assembly.

B. The building shall be at least 500 feet from any other adult use.

C. The building shall have the same colors, finishes and materials as recently approved site plans in the vicinity as determined by the Board of Site Plan Review.

The 2000 amendment removed the special exception requirement and required that distances be measured from building to building. (Tr. p. 492). Previously, distances had been measured from and to property lines.

Pursuant to a stipulation of settlement dated August 24, 2000, 490 Habitat agreed to make a "diligent good faith effort" to relocate and was allowed to continue operating at 490 West Jericho Turnpike until September 1, 2003. (Court Exh. I).

Nevertheless, adult entertainment use at this location continued following the expiration of the extended deadline of September 1, 2003 set forth in the stipulation.

490 Habitat never relocated and TJS of New York, Inc. ("Plaintiff" or "TJS"), which purchased the business in 2002, presently operates "The Oasis," a topless bar, (Tr. p. 41), without a certificate of occupancy.

On June 7, 2004 the Town moved in New York state court for an order of closure based upon TJS' failure to relocate. TJS responded by commencing this lawsuit seeking a declaratory judgment and permanent injunction declaring the Town of Smithtown's adult use ordinance unconstitutional.

II.    Analysis

    A.    The Law

    Plaintiff has conceded the facial constitutionality of Town Code §322-30.2,

"Adult Retail Shop or Adult Entertainment." (Pl. Pre-Trial Brief, p.5). However,

plaintiff challenges the ordinance claiming that it does not provide a reasonable number

of locations for adult entertainment businesses to open and operate. The Town of

Smithtown argues that the number of alternative sites at the time of enactment of the

ordinance, and to date, is sufficient to meet constitutional muster.

    Zoning ordinances may limit adult entertainment businesses to particular locations

provided that "reasonable alternative avenues of communication" remain for adult-

oriented businesses. Buzzetti v. City of New York, 140 F.3d 134, 140-41 (2d Cir. 1998)

(citing City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 53-54, 106 S.Ct. 925, 89

L.Ed.2d 29 (1986)). Reasonableness requires an assessment of available alternatives,

Hickerson v. City of New York, 146 F.3d 99, 107-108 (2d Cir. 1998), and whether these

alternatives afford a reasonable opportunity to locate and operate such a business,

Buzzetti, 140 F.3d at 140-141. The seminal case in this area is City of Renton v.

Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

    In Renton, the Supreme Court upheld a zoning ordinance which prohibited adult

motion picture theaters from locating within one thousand (1,000) feet of a residential

zone, church, school or park, noting:

    ". . . the ordinance leaves some 520 acres, or more than five percent of the

-4-

entire land area of Renton, open to use as adult theater sites. The District
Court found, and the Court of Appeals did not dispute the finding, that the
520 acres of land consists of '[a]mple, accessible real estate', including
'acreage in all stages of development from raw land to developed,
industrial, warehouse, office, and shopping space that is criss-crossed by
freeways, highways, and roads.'"

475 U.S. at 53, 106 S.Ct. 942 (quoting App. to Juris. Statement 28a).

Responding to the argument made by the theater owners, and adopted by the

Circuit Court, that the sites proposed by the City were encumbered with leases or not

"commercially viable," the Renton Court stated:

"We disagree with both the reasoning and the conclusion of the Court of
Appeals. That respondents must fend for themselves in the real estate
market, on an equal footing with other prospective purchasers and lessees,
does not give rise to a First Amendment violation. And although we have
cautioned against the enactment of zoning regulations that have 'the effect
of suppressing, or greatly restricting access to, lawful speech,' [Young v.]
American Mini Theatres, 427 U.S., [50] at 71, n. 35, 96 S.Ct., [2440] at
2453, n. 35 (plurality opinion), we have never suggested that the First
Amendment compels the Government to ensure that adult theaters, or any
other kinds of speech-related businesses for that matter, will be able to
obtain sites at bargain prices. See Id., at 78, 96 S.Ct., at 2456 (Powell, J.,
concurring) ("The inquiry for First Amendment purposes is not concerned
with economic impact").

475 U.S. at 54, 106 S.Ct. at 932.

Decisions subsequent to Renton have refined the definition of availability to

include: sites in industrial zones, see, e.g. Tollis Inc. v. County of San Diego, 505 F.3d

935, 941 (9th Cir. 2007) (citing Topanga Press, Inc. v. City of Los Angeles, 989 F.2d

1524, 1531 (9th Cir. 1993)); multiple sites under single ownership, see, e.g. Daytona

Grand, Inc. v. City of Daytona Beach, Fla., 490 F.3d 860, 869 (11th Cir. 2007), cert.

denied, 128 S.Ct. 1246 (2008); currently unavailable sites, those requiring a new building, sites with owners reluctant to sell to an adult entertainment outlet or those with "no evidence that any of the land is for sale," see, e.g. David Vincent, Inc. v. Broward County, Fla., 200 F.3d 1325, 1334-1335 (11th Cir. 2000); sites which will result in lost profits or higher overhead costs, see, e.g. Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1531 (9th Cir. 1993); lots which must be joined to meet square footage requirements, see, e.g. Casanova Entertainment Group, Inc. v. City of New Rochelle, 375 F. Supp.2d 321, 332, aff'd, 165 Fed. Appx. 72 (2d Cir. 2006); industrial sites, see, e.g. Daytona Grand, 490 F.3d 860 at 871; "undeveloped land, waterfront property, warehouse areas and parking lots," Stringfellow's of New York, Ltd. v. City of New York, 91 N.Y.2d 382, 404, 671 N.Y.S.2d 406, 694 N.E.2d 407 (N.Y. 1998); and sites under government ownership or subject to long term leases, see, e.g. Woodall v. City of El Paso, 49 F.3d 1120, 1125-1126 (5th Cir. 1995).

As noted by the New York Court of Appeals in Stringfellow's, and cited with favor by the Second Circuit in Hickerson, 146 F.3d 99 at 106:

"Under Renton, land that is already occupied by commercial and manufacturing facilities and undeveloped land that is not for sale or lease is not to be automatically deemed unavailable. Further, any reduction in profitability caused by a forced relocation is not relevant to the availability inquiry (see, Renton v. Playtime Theatres, supra, at 53; Woodall v. City of El Paso, 49 F3d 1120, 1124-1125, cert denied 516 US 988; Grand Brittain v. City of Amarillo, 27 F3d 1068, 1070; see also, Matter of Town of Islip v. Caviglia, [73 N.Y.2d 544], at 555, 560 [542 N.Y.S.2d 139, 540 N.E.2d 215 (1989)] [areas of a municipality set aside for adult uses need not be prime locations]). Rather, the inquiry is limited to the *physical* and *legal*

-6-

availability of alternative sites within the municipality's borders and
whether those sites are part of an actual business real estate market (see,
Topanga Press v. City of Los Angeles, 989 F2d 1524, 1530-1531, cert
denied 511 US 1030; see also, Woodall v. City of El Paso, supra; Alexander
v. City of Minneapolis, 928 F2d 278).

In determining whether proposed relocation sites are part of an actual
business real estate market, the courts have considered such factors as their
accessibility to the general public, the surrounding infrastructure, the
pragmatic likelihood of their ever actually becoming available and, finally,
whether the sites are suitable for 'some generic commercial enterprise' (see,
989 F2d, at 1531)."[1]

Stringfellow's, 91 N.Y.2d at 402.

"As the Eleventh Circuit observed, '[t]he ideal lot is often not to be found.'
David Vincent, Inc. v. Broward County, Fla., 200 F.3d 1325, 1334 (11th Cir.
2000).

[T]he fact that some development is required before a site can
accommodate an adult business does not mean that the land is, *per se*,
unavailable for First Amendment purposes . . . Examples of impediments to
the relocation of an adult business that may not be of constitutional
magnitude include having to build a new facility instead of moving into an
existing building; having to clean up waste or landscape a site; bearing the
costs of generally applicable lighting, parking, or green space requirements;
making due with less space than one desired; or having to purchase a larger
lot than one needs."

Allno Enterprises, Inc. v. Baltimore County, Maryland, 10 Fed. Appx. 197, 202 (4th Cir.

June 1, 2001).

---

[1]Although Plaintiff's counsel sought to equate "generic commercial enterprise" and his
client's business with retail stores of the size of drug stores chain outlets, the courts have only
required infrastructure (electricity and water) and accessibility. "Simply because a particular
property is well suited for other commercial or industrial uses does not render it unavailable.
Indeed, the qualities which make these sites attractive as industrial sites, to wit, the ability to
build-to-suit and their proximity to highways, thus facilitating public access, make these sites
especially well suited for the location of a generic commercial establishment. * * *." Allno
Enterprises, Inc. v. Baltimore County, Maryland, 10 Fed. Appx. 197, 202 (4th Cir. June 1, 2001);
see also Tollis, 505 F.3d at 942.

Examples of sites universally held to be "unavailable" are "land under the ocean, airstrips of international airports, and sports stadiums." Daytona Grand, 490 F.3d at 872 (quoting David Vincent, 200 F.3d at 1335).

As in Renton, Plaintiff contends that not all of the proposed sites are truly available for adult entertainment use and that there are, therefore, insufficient alternative avenues of expression afforded to its business.

The Defendant Town has the burden of proving the existence of alternative avenues of communication. Lim v. City of Long Beach, 217 F.3d 1050, 1054 (9th Cir. 2000). However,

> "[a] city cannot merely point to a random assortment of properties and simply assert that they are reasonably available to adult businesses. The city's duty to demonstrate the availability of properties is defined, at a bare minimum, by reasonableness and good faith. If a plaintiff can show that a city's attempt is not in fact in good faith or reasonable, by, for example, showing that a representative sample of properties are on their face unavailable, then the city will be required to put forth more detailed evidence. But where a city has provided a good faith and reasonable list of potentially available properties, it is for the Plaintiffs to show that, in fact, certain sites would not reasonably become available. See also Hickerson v. New York City, 146 F.3d 99, 107 (2d Cir. 1998). . . . The burden of showing that particular sites would not reasonably become available therefore rests with the Plaintiffs."

Lim, 217 F.3d 1050, at 1055-1056; see also Stringfellow's, 91 N.Y.2d 382.

In preparation for trial, the Court ordered the Defendant to provide a list of proposed alternative sites and the Plaintiff to respond with its reason(s), if any, for disqualification of each site. The Town met its initial burden by providing a detailed list

of thirty five (35) sites, going beyond the specificity required to meet its burden. See, e.g. Hickerson, 146 F.3d 99 at 107. This list had been provided to Plaintiff's predecessor in 1999.

Once the proposed alternatives were presented to the Plaintiff, it was Plaintiff's responsibility to assess the sites and make reasonable efforts to relocate or notify the Defendant of its legitimate objections to the sites proffered by the Town. Tollis, 505 F.3d at 941.

Although TJS cited, with apparent favor, the analysis undertaken in 801 Conklin Street Ltd. v. Town of Babylon, 38 F.Supp.2d 228 (E.D.N.Y. 1999), and despite having had the list of proposed sites for at least five (5) years, its Response to On Site Availability ("Response") finally filed in February 2008 still did not specify the claimed inadequacies of the sites provided by the Town.

Rather, Plaintiff's Response made only generalized objections to each site referring to unsubstantiated "topographical" concerns and claiming that particular parcels "appear[s] to be environmentally sensitive" or were within five hundred (500) feet of unnamed "similar places of public assembly."

A trial was scheduled to determine whether the Town's ordinance provided "reasonable alternative avenues of communication."

B. Method

In evaluating the reasonableness of alternative avenues of communication available to an adult business, courts may employ different techniques of analysis, including the ratio of total municipal acreage to acreage available to adult businesses, see, e.g. Renton, 475 U.S. 41, 106 S.Ct. 925 (five hundred twenty (520) acres, or more than five percent (5%) of the entire Renton land area, was deemed sufficient); see also Illinois One News, Inc. v. City of Marshall, Illinois, 477 F.3d 461 (th Cir. 2007) (four percent (4%) of city land); the ratio of commercial acreage to the acreage "available" to the operation of adult businesses, see e.g. Diamond v. City of Taft, 215 F.3d 1052 (9th Cir. 2000); and the number of proposed sites compared to the number of adult entertainment uses which will be required to relocate, see e.g. Hickerson, 146 F.3d 99; Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301 (11th Cir. 2003); see also Tollis, 505 F.3d 935; N.W. Enterprises, Inc. v. City of Houston, 352 F.3d 182, n. 20 (5th Cir. 2003) (one site more than number of existing businesses sufficient).

The Town of Smithtown is a residential suburb, (Tr. p. 495), in the metropolitan New York area with a population density of approximately twenty-five hundred (2,500) people per square mile, (Tr. p. 495), and a comparatively small percentage of land available for commercial use. Taking into consideration "rivers, lakes and things like that" reduces the land acreage to approximately fifty (50) square miles or thirty one thousand, eight hundred (31,800) acres. (Tr. p. 495). Approximately eighty-five percent (85%) of the Town is zoned and utilized for residential purposes. Between nine percent

-10-

(9%) and eleven percent (11%) of the total land area is zoned for commercial land use. (Tr. p. 496)[2] The remainder is reserved for "institutional purposes." (Tr. pp. 495-496).

In MJ Entertainment Enterprises, Inc. v. City of Mount Vernon, N.Y., 328 F.Supp.2d 480 (S.D.N.Y. 2004), total commercial area, rather than total land area, was found to be the appropriate basis for determining whether the allotted percentage would provide reasonable alternative avenues of communication. In MJ Entertainment, less than one percent (i.e., .67%) of available commercial land was available for adult entertainment and deemed sufficient to withstand constitutional scrutiny.

Smithtown contends that its ordinance allows for fourteen percent (14%) of land zoned for commercial use to be utilized for adult entertainment.

> "'Courts have considered a variety of criteria, from the percent of land allocated to such uses to the supply and demand within the population, e.g., the number of sites compared with the number of adult businesses currently in operation or seeking to open' in determining whether a sufficient amount of alternative avenues of communication exist. MJ Entm't, 328 F.Supp.2d at 485. 'Although Renton referred to the percent of total land available, district courts have not been precise as to whether the relevant percent is based on the total land or the percent of land available for commercial uses and have applied both methods.' Id. We agree with the court in MJ Entertainment that the relevant inquiry for a city such as New Rochelle, is the total commercial area, rather than the total land area because like Mount Vernon, New Rochelle is an old suburb: '[i]t is fully "built out", there is very little undeveloped land' and the character of the municipality as overwhelmingly residential is already set. Id."

Casanova, 375 F.Supp.2d at 340.

Based upon the similarity of the Town of Smithtown to the cities of Mount Vernon

---

[2]According to Mr. DeRubeis' testimony, the remainder is categorized as "institutional," (Tr. p. 495) but was not defined.

and New Rochelle, the methodology utilized in <u>MJ Entertainment</u>, i.e. ratio of available land for adult entertainment use to total commercial area, will be utilized here.

C. Relevant Time of Inquiry

The parties disagree on the appropriate time for assessment of available alternative sites.

The Town argues that the relevant time for assessment of alternative available sites is the effective date of the zoning enactment. The Plaintiff contends that "logic" argues in favor of assessment on the date of trial and characterizes the Town's position as "ridiculous" (Plaintiff's "Response to Court's Request for Brief").[3]

Plaintiff is incorrect. It is a municipality's burden to pass a constitutional ordinance which, in order to be constitutional, must provide sufficient alternative avenues of expression on the date of enactment. <u>Renton</u>, 475 U.S. 41; <u>Tollis</u>, 505 F.3d 935; <u>Lim</u> 217 F.3d at 1054. Moreover, and contrary to Plaintiff's counsel's representation that no relevant case law exists, (Pl. Response to Court's Request for Brief), the District Court in <u>Bigg Wolf Discount Video Movie Sales, Inc. v. Montgomery County, Md.</u>, 256

_____

[3]Indeed, at trial Plaintiff's counsel stated:

"MR. WILSON:  I guess my question is what's wrong with waiting and waiting until there were no sites and then asking to open. That's what the Constitution says. . . . I believe there's only one issue and that is on the day you enter your judgment are there sufficient alternative sites.

(Tr. p. 122).

F.Supp.2d 385 (D. Md. 2003), specifically envisioned the instant scenario:

> "Although many courts have not explicitly said so, most have logically
> analyzed the number of available sites in relation to the number of adult
> businesses that would need to relocate at the time the ordinance was passed.
> The situation will always be fluid, with businesses moving in and out, and
> the courts should not be involved repeatedly with litigation determining the
> validity of a zoning ordinance. More importantly, if the reasonableness of
> alternative sites must be reassessed for each business at the time it decides
> to relocate, an incentive would be created for businesses to holdout and then
> to claim that there are no available sites after the other businesses have
> relocated or litigated. [emphasis added]. Such a situation not only puts
> enormous bargaining leverage in the hands of the last holdout, it is a
> nonsensical way to deal with zoning problems.
>
> To the extent that it considers this question, the case law from other circuits
> supports this time-frame. The test is whether the restrictions allow for
> reasonable alternative avenues of communication currently, not whether
> they always will allow for reasonable alternative avenues of
> communication. The Ranch House, Inc. v. Amerson, 146 F.Supp.2d 1180,
> 1212-1213 (N.D. Ala. 2001) [rev'd in part, vacated in part on other
> grounds, 85 Fed. Appx. 191 (11th Cir. 2003) (table)] [emphasis in original].
> Even the Ninth Circuit, which has a more stringent requirement for
> adequate alternative channels than this circuit, looks at the number of adult
> entertainment business that must be relocated at the time that the new
> zoning regime takes effect. See Topanga Press, 989 F.2d at 1532-33. Most
> courts considering this question implicitly adopt this time frame (sic) and
> there are no cases that challenge it or demand that the test for available sites
> include safeguards for future change. Ranch House, 146 F.Supp.2d at
> 1213."

Bigg Wolf, 256 F.Supp.2d at 397.

In Daytona Grand, the Eleventh Circuit Court stated:

> "A new zoning regime must leave adult businesses with a 'reasonable
> opportunity to relocate,' and 'the number of sites available for adult
> businesses under the new zoning regime must be greater than or equal to the
> number of adult businesses in existence at the time the new zoning regime
> takes effect.' Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1310-
> 11 (11th Cir. 2003) (quoting David Vincent, 200 F.3d at 1337 n. 17)."

490 F.3d at 870 (emphasis added).

Indeed, the Second Circuit has implicitly found that the appropriate date for assessment of proposed alternative avenues of communication is the date of enactment by citing favorably in Hickerson, 146 F.3d 99, to Town of Islip v. Caviglia, 73 N.Y.2d 544, 555, 542 N.Y.S.2d 139, 540 N.E.2d 215 (N.Y. 1989) ("there must be ample space available for adult uses after the rezoning which will not reduce the number of or accessibility to adult outlets") and Stringfellow's, 91 N.Y.2d 382, 419 (the City required to show sufficient "alternative receptor sites" for the existing adult uses required to relocate). And in Topanga Press, 989 F.2d at 1532-33, the Court held that the number of sites available must merely be greater than or equal to the number of adult entertainment businesses in existence at the effective date of the ordinance.

In Buzzetti, 140 F.3d at 141, the Second Circuit upheld an adult entertainment zoning ordinance, which permitted the existing adult entertainment establishments to continue operations but did not require that future adult entertainment establishments would be entitled to open at new locations.

And in Daytona Grand, 490 F.3d 860, the Court relied upon its finding in Red-Eyed Jack, Inc. v. City of Daytona Beach, 322 F.Supp.2d 1361 (M.D. Fla. 2004), some three years earlier, as to the number of available sites.

Moreover, Plaintiff's reference to Stringfellow's is inapposite. The New York City Ordinance which was the subject of a First Amendment challenge was enacted in October of 1995. The lawsuit commenced some four (4) months later. Here, the Town of

-14-

Smithtown passed the original ordinance in 1994 and amended it in 2000, and presented a list of alternative sites in 1999 to Plaintiff's predecessor. (Tr. p. 452). Plaintiff did not commence this suit until 2004, upon commencement by the Town of a closure action in State court, and has failed to point to any law which supports its position.

Insofar as Plaintiff suggests that anything that occurred prior to its corporate formation in 2003 is "not relevant to any issue in this case," (Plaintiff's Response to Court's Request for Brief), the Court disagrees. Plaintiff was aware of the nature of the restrictions upon an adult entertainment establishment when he purchased and opened the business. Plaintiff's counsel had represented Plaintiff's predecessor in its litigation against the Defendant on the same basis, (Tr. 45, 47, 48, 49-51), and Plaintiff retained the same expert as his predecessor to "try to find alternative sites," (Tr. p. 603). At the time of enactment of §322.30.2, there were three (3) adult venues, including Plaintiff's site, in the Town. In the years following the enactment of the ordinance, four (4) new adult businesses opened. Moreover, Plaintiff's principal sole "effort" to comply with the stipulation was allegedly approaching two (2) real estate brokers two (2) years after the expiration of the extended amortization date. (Tr. p. 56).

In any event, while this reasoning would condone the Plaintiff's predecessor's failure to respond to Defendant's proffered sites prior to its incorporation in 2003, it would still fail to explain Plaintiff's failure to raise specific legitimate objections to the

proposed sites over the past five (5) years,[4] or to relocate, as its principal acknowledged was required no later than September 1, 2003, (Tr. pp. 48-51). (Tr. pp. 55-56). Indeed, to ignore the history of the site between the 1994 enactment of the original ordinance and 2003 would reward recalcitrance on Plaintiff's part.

Finally, Plaintiff's interpretation would place adult entertainment businesses in a superior position to other businesses in the Town, a position specifically eschewed by the Renton Court, 475 U.S. 41, 54 (citing Young v. American Mini Theatres, Inc., 427 U.S. 50, 78, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)).

Based upon the foregoing, this Court will assess Defendant's alternative sites as of 1994.

III.    The Trial

A bench trial commenced on February 5, 2008, at which all of the sites proposed by the Town were explored through the testimony of Plaintiff's expert witness, Steven Cataldo, and the Town's expert, Frank DeRubeis.

During the extensive period between the enactment of the 1994 ordinance and this trial, the parties' experts were deposed in both this and the prior litigation. This evidence, in conjunction with the submissions and testimony adduced at this trial, evinced the evolution of the Town's commercial property, the consistency of the parties' positions

---

[4]As recently as February 2008, and despite its alleged admiration for the District Court's methodology in 801 Conklin Street, Plaintiff had still neither provided objective, specific and substantiated objections to the sites provided by Defendant in 1999 and 2004, nor relocated.

over the years and the credibility of their witnesses.

A.    Plaintiff's Expert

Steven Cataldo, an architect for thirty (30) years, testified for the Plaintiff. Mr.
Cataldo had been employed by Plaintiff's predecessor in the 1994 lawsuit. In 2000 he
prepared a list of properties which he had considered as available sites for his client,
(Adult Entertainment Site Study Ex. S). He was deposed in this lawsuit in 2004 and
participated in the preparation of Plaintiff's court ordered Response to Plaintiff's
alternative sites. (Tr. p. 777).

Mr. Cataldo's trial testimony appeared to be based upon several incorrect
assumptions. First, he excluded many potential sites on the Town's proposed list based
upon his interpretation of Town Code §322-3(2) and unsubstantiated claims, (Tr. p. 611),
of environmental sensitivity for any site which he assessed to have of a slope of fifteen
percent (15%) or more. However, and despite his testimony that he had "visited,"[5] (Tr. p.
605), all of the Town's proposed sites, he admitted that he had never measured any of the
allegedly offending slopes on any of the sites, (Tr. p. 781), which he disqualified on this
basis. He also claimed that he had never seen a distinction made by the Town between
natural and artificial slopes, (Tr. pp. 614-615), which testimony was contradicted by the
Town's expert and the fact that the Town has consistently maintained its position on the

---

[5]Mr. Cataldo did not indicate when he had visited the sites. It was unclear whether he
was relying upon recent visits or those made prior to 1999. (1999 Dep. pp. 25-26).

-17-

topographical viability of all of the proposed sites.[6] (Tr. 835).

Similarly, Mr. Cataldo expressed a "general concern" with methane gas contamination on certain sites which were near landfills but admitted that he was not aware of any contamination, had not sought testing at any site, (Tr. p. 781), and did not know if one of the sites was actually on a landfill, (Tr. p. 618).

His contention that certain sites violated the subject ordinance because they were within five hundred (500) feet of "similar places of public assembly," (Town Ordinance §322-30.2(A)), was based upon his own interpretation and definition of that term and anecdotal claims that he had seen families at neighboring businesses in the area. Although the Town Code does not define "places of public assembly," §322-3 defines "public or semipublic building(s)." None of the neighboring uses which "concerned" Mr. Cataldo fell within the scope of §322-3[7], and none were permitted uses in Community Facility Zones. (Town of Smithtown Special Purpose Districts Table of Use Regulations). Moreover, this testimony was presented despite the Town's continued, consistent and unequivocal assessment of the proposed sites as viable and the neighboring

---

[6]Mr. Cataldo's position, if correct, would permit any landowner to manipulate development and land use within the Town. In any event, the Planning Board has authority to grant variances on the use of environmentally sensitive land (Smithtown Zoning Code §§322-19) (322-30.4).

[7]The definition of "place of public assembly" must be analyzed according to the context of the phrase and the legislative intent of the jurisdiction. For example, in New York City "a topless dancing cabaret [    ] is a place of public assembly." Casanova, 375 F.Supp.2d at 338; see also, 801 Conklin St., 38 F.Supp.2d 228, in the Town of Babylon "theater" and "senior citizen residence" included in ordinance as places of public assembly; See also, 593 F.Supp. 655 (definition based upon maximum capacity and fire code).

-18-

businesses not within the classification of similar "places of public assembly." (Tr. pp. 586-588, 589-592). In addition, and despite the 2000 amendment to the Code, which changed the method of measurement, it appeared that Mr. Cataldo had utilized the method which was no longer approved in the Code.[8] (Tr. pp. 785-786).

Most troubling, however, were the inconsistencies between Mr. Cataldo's trial testimony which asserted that there were no viable alternative sites to which TJS could relocate, (Tr. p. 771), his deposition testimony in 1999 and 2004 which were to the contrary and his own list of alternative sites prepared in 2000, (Adult Entertainment Site Study, Ex. S), which also indicated otherwise.

Based upon the foregoing, Mr. Cataldo's reliability and credibility as an expert were discounted in evaluating whether sufficient alternatives exist in the Town of Smithtown. See, e.g. Hickerson, 146 F.3d at 108.

B.    Defendant's Expert

The Defendant presented Frank DeRubeis as its expert. Mr. DeRubeis was employed as a municipal planner in Suffolk County between 1974 and 1977 and in the Town of Smithtown since 1977. (Tr. p. 59). He has served as the Town Director of Planning since 1985. He prepared the list of thirty-five (35) alternative sites provided to Plaintiff's predecessor in 1994 which, he contends, were viable in 1994 and 1999 and

---

[8]This was contrary to his testimony in 2004. (Dep. 2004 pp. 64, 73). However, his 1999 deposition indicated that he measured from lot line to lot line.

-19-

continue to be so, with the exceptions only of those sites which are now within five hundred (500) feet of other adult entertainment sites which opened after the ordinance was enacted. (Tr. p.62). The list was prepared prior to the enactment of the original ordinance to make certain that sufficient alternative available sites existed at the time the ordinance became effective. Certain sites were eliminated as impractical. (Tr. p. 68). On each proposed Town site a building of a minimum of one thousand two hundred (1,200) square feet could be built and meet the parking (§322-62) setback (§322-65) and frontage requirements for adult entertainment establishments. (Tr. p. 572).[9]

Mr. DeRubeis was entirely credible. He was clearly very knowledgeable about the history of the sites about which he testified, the Town Code and planning principles in general. His testimony at trial was consistent with his prior deposition testimony and the Town's position that at the time of the enactment of §322-30.2 of the Town's Zoning Code in 1994, and as of 2008, sufficient alternative avenues of communication exist within the Town.


C. The 35 Sites

The Town provided Plaintiff (and its predecessor) with a non-exclusive list of thirty five (35) sites which Mr. DeRubeis had examined and determined to be available

_____

[9]Although Plaintiff's principal Thomas Murray testified that the present site is three-quarters (3/4) of an acre and the business is located in sixteen hundred (1,600) square feet of the first floor of the building, Plaintiff's expert conceded at trial that the present site is one-third (1/3) of an acre. (Tr. p. 779).

for Plaintiff's relocation. It bears noting that despite Plaintiff's expert's attempts to raise objections regarding each site, the Town's expert maintained that the sites were available in 1994 and continue to be so (with the exception of sites which are now within five hundred (500) feet of existing adult uses which opened following Plaintiff's and its predecessor's extended period of failure to relocate). Thus, the Defendant would be estopped from raising objections to Plaintiff's relocation to any of the remaining sites. See, e.g. Casanova, 375 F.Supp.2d at 340; David Vincent, Inc. v. Board of County Commissioners of Broward County, no. 97-7164-civ, 1998 WL 35156026 (S.D. Fla. Feb. 3, 1998).

Moreover, and insofar as Plaintiff's counsel tried to demonstrate that if other adult uses opened in every area proposed by the Town, it would preclude his client from relocating within five hundred (500) feet of those hypothetical adult uses, and reduce the actual number of available sites to eight (8) or nine (9) at some future date, he failed to provide any factual, legal or logical basis for this proposition.

To this end, Plaintiff's counsel also tried to show that other existing adult establishments are presently operating illegally and should thus be considered as additional businesses which would be required to relocate. However, Plaintiff failed to meet its burden of proof on this issue and since those businesses, if indeed they are required to move, may just as likely chose to close, this argument was not considered.

-21-

## Site 1 Carlson PreCast

Mr. Cataldo sought to disqualify this site on the grounds, *inter alia*, that it was "environmentally sensitive"[10] and subject to potential methane gas contamination. Neither of these claims was substantiated. Mr. DeRubeis found "just under" an acre to be available and meet all necessary zoning requirements. While the Court adopts Mr. DeRubeis's finding, it finds this site to be unavailable because the land to which Mr. DeRubeis referred is land-locked. Since the available site has no road access it is not suitable for a generic commercial enterprise.[11]

## Site 2 Am-Far Manufacturing

Although Mr. Cataldo again expressed unsubstantiated "concerns" regarding methane contamination and "environmental sensitivity," he conceded that one-half (½) acre was unaffected by either. In his 1999 deposition, Mr. Cataldo indicated only that "part of that site are [sic] ballfields towards the back." (p. 40). Mr. DeRubeis had considered the neighboring landfill and the slopes to which Mr. Cataldo referred prior to arriving at his determination that this site contained two and one-half (2 ½) available

---

[10] Throughout the trial Mr. Cataldo objected to properties which he claimed had slopes in excess of fifteen percent (15%) as being "environmentally sensitive." He had not measured any of the slopes. Moreover, the Town's expert explained that only naturally occurring slopes created considerations of environmental sensitivity. (Tr. 114, Ord. 322-3). Mr. Cataldo did not identify any naturally occurring slopes.

[11] In some jurisdictions this site would be deemed available because Plaintiff did not demonstrate that lack of road access was an obstacle that could never be overcome or exorbitant expense involved in providing access. (Woodall v. City of El Paso, 49 F.3d 1120, 1124) (5th Cir. 1995).

-22-

acres. (Tr. 115). In 2004 Mr. Cataldo disqualified the site because, "[a]pparently, it's rezoned to industrial business." (Dep. 2004 p.77). In his 2000 Study, Mr. Cataldo's only comment stated "Sand Pit & Precast Operation." (Ex. S).

This site is a two and one half (2 ½) acre alternative site for adult entertainment.

## Site 3 Schleider

According to Mr. Cataldo, this site was not "available" because it had a landfill to the rear, raising methane "potential," had been used for outdoor storage and a concrete crushing business[12] and had slopes which in his opinion made it "environmentally sensitive" pursuant to Town Ordinance §322-3. In 1999[13], Cataldo had only indicated a concern about a nearby park and landfill, (Dep. p. 40); in his self-generated study ("Study") created for Plaintiff's predecessor in 2000, (Ex. S), and in his 2004 deposition in this case, Mr. Cataldo's only objection to Site 3 was that the site was "too small." However, he could not state how he had arrived at that conclusion. At trial he conceded that two and one-quarter (2 1/4) acres were available for his client's purposes. Despite his unsubstantiated "concerns," he agreed that a "correctly built" structure could be erected.

This is an alternative adult entertainment site of three and one third (3 1/3) acres.

---

[12] Plaintiff has failed to point to any case law for the proposition that this property's prior uses would disqualify it.

[13] Mr. Cataldo was deposed in 490 Habitat v. Smithtown, no. CV-99-3731, regarding all of the sites which are the subject of this action.

### Site 4 N.E. Mines

The total site is twenty-two and one-half (22.5) acres. Mr. Cataldo's objections to this site were that the northern five hundred (500) feet were in a Light Industrial zone, and a small area was within five hundred (500) feet of a residential area.

Mr. Cataldo again raised "concerns" of methane gas and slopes, neither of which had he tested or measured. His 2004 deposition testimony indicated only that it seemed an "unreasonable" site. His 2000 Study states only "Sand Pit & Pre Cast Operation" and a comment that it was not reasonable to believe Plaintiff's business could be integrated into the HI use zones. (Ex. S). In 1999, he objected to the site as being within five hundred (500) feet of residential property. (1999 Dep. p. 43).

The Court finds that fourteen (14) acres is available to TJS.

### Sites 5, 6, 7 Izzo

At trial Mr. Cataldo cited unsubstantiated "environmental sensitivity," proximity to residential districts and methane "potential" as reasons to disqualify these sites. However, in 1999 he testified that all of these sites were partially available and met all other criteria. (Dep. p.44). In his 2004 deposition Cataldo characterized each site as a "Sand Pit," (p.79), and in his Study, (Ex. S), he finds it unreasonable "to believe that an 'adult use' can be integrated" into the area. He did not raise these issues at trial.

Without explanation or substantiation, Mr. Cataldo also made a conclusory observation that the Izzo sites were "characterized by open land use and the entire area is

-24-

inappropriate for this particular type of use. Some generic commercial enterprise really could not be built here." (Tr. p. 646).

Based upon Mr. DeRubeis' testimony, the Court finds that two and one half (2 ½) acres of site 5 are available for adult entertainment, that three (3) acres of site 6 are available for adult use and that two (2) acres of site 7 are available for adult entertainment use.

## Site 8 Toys R Us

According to Plaintiff's expert, approximately two thirds (2/3) of this site is within five hundred (500) feet of a residential zone which would leave one and one-half (1 ½) acres for TJS, but for the fact that the remainder is within five hundred (500) feet of Blush, another adult use.

Although Mr. Cataldo could not recall when Blush (or its predecessor) opened, (Tr. p. 651), Mr. DeRubeis stated that Blush opened in 2000 or 2001. Mr. Cataldo disqualified the remainder of the site as being within five hundred (500) feet of a bowling alley and book store which he described as "similar places of public assembly," despite the Town's determination to the contrary and the fact that neither is so defined in the Code or even permitted in a Community Facility District (Smithtown Zoning Code, §322-7; Smithtown Code Special Purpose Districts, Table of Use Regulations).

In 1994 and 1999 two (2) acres were available to TJS. As of today, the site is not available.

-25-

## Site 9 Office Condo

In 1999 Mr. Cataldo objected to this property as being within five hundred (500) feet of Carousel East, a bar, (1999 Dep. p. 46), which, he conceded, he had measured from the property line.

At trial, Mr. Cataldo indicated that the site was also within five hundred (500) feet of a park, which was contradicted by Mr. DeRubeis (Tr. p. 512). He also cited a bowling alley and a crafts store, which he incorrectly characterized as similar places of public assembly. (Tr. pp. 652-653).

This site is presently unavailable but was a viable alternative site in 1994.


## Sites 10 and 11

Sites 10 and 11 were repeatedly confused during the trial. It appears that Site 10 is presently occupied by a bar and Site 11 is presently occupied by Blush, an adult entertainment use, precluding them as available sites today.[14] They were, however, available in 1999 and 1994.

At trial, Mr. Cataldo objected to these sites as being within five hundred (500) feet of Cannon Park, a bowling alley, a crafts store and book store. In 1999 his only reason for disqualifying these sites was their tenancy. (1999 Dep. p. 46). In 2004, Mr. Cataldo objected to these sites only on the basis of his own unsubstantiated claim that parking

---

[14]It appears from Mr. DeRubeis' testimony that, despite the site's proximity to Blush, three and one half (3 ½) acres is still available for adult entertainment use. (Tr. p. 515).

would be inadequate. (2004 Dep. p. 115).

Mr. DeRubeis testified that these sites have one (1) acre available for TJS, but for the fact that Blush, an adult entertainment business, opened in 1999. It appears that Blush's predecessor, Carousel East, was an adult use or a bar, (1999 Dep. 46). Based upon his testimony that he had been advised by the Town Attorney, John Zollo, that the site was too close to a park[15], Mr. Cataldo was at a loss to explain how Blush had opened after his alleged inquiry and continues to operate. Nor did he explain why he had failed to so testify in 1999. (Tr. p.666).

Thus, and although TJS could not open on these sites today, or when it decided to commence its suit, or even when it purchased the business with full knowledge of the infirmities of its purchase, the sites were available at the time the ordinance was enacted.

## Site 12 Parking Lot of Multiplex Theatre

At trial Mr. Cataldo tried to characterize the theater as a "similar place of public assembly." (Tr. p. 671). In his 1999 testimony Mr. Cataldo had objected to this site as having insufficient parking, apparently based upon the premise that the site would remain as presently configured. (1999 Dep. 47). His 2000 Study indicated only that the proposed site was a "Parking Lot for Multi-Plex [sic]."

As presently configured, this twenty-five (25) to twenty-seven (27) acre site

---

[15]Mr. Cataldo then claimed that he had actually inquired "whether or not that strip of grass would have formed a park." (Tr. 666).

-27-

would require TJS to build on a six and one-half (6 ½) acre area over a water recharge basin after securing Town permission. (Tr. p. 216). The necessity of seeking that permission does not obviate the availability of the six and one-half (6 ½) acres.

Moreover, Plaintiff could purchase the entire site obviating the need to build on the water recharge basin.

This site has approximately twenty-five (25) acres available as an alternative site.

## Site 13 Sym's

This site consists of six (6) acres. Although Mr. Cataldo sought to define the local administrative offices of the Girl Scouts as a "place of similar public assembly,"[16] that position is unavailing in light of the testimony of Mr. DeRubeis, the proposal of the site by the Town and the zoning code of the Town of Smithtown. Mr. Cataldo also incorrectly assumed that his client would have to use the site as presently configured which would create a "use behind a use," or buy Sym's and get Town permission to make the present structure a multi-tenant facility. Thus, Mr. Cataldo ignored the possibility of reconfiguring the site, presumably based upon cost factors.

In his own assessment of available sites, created in 2000, Mr. Cataldo only indicated a concern about inadequate parking. In 2004 he indicated that a) he believed the premises was limited to a single retail tenant, (Dep. 123), but b) could not recall if he ever made an inquiry regarding the site, and c) then indicated that it would, in any event,

---

[16]This misconception was posited as an objection in 1999 as well. (Dep. p. 47).

-28-

be too close to site 14, an adult use, but d) admitted he had never measured the distance. (Dep. 124).

This is an alternative site of six (6) acres.

## Site 14 The Scene[17]

This site contains an adult use which opened sometime after the ordinance went into effect. (Tr. 238). It was a suitable alternative site at the time of the enactment of the ordinance.

Interestingly, in 1999 Mr. Cataldo indicated that the site was unavailable because it was near the Girl Scout administration building and had a long-term lease. (1999 Dep. p. 48). Although he did not know the term of the lease, he testified that it was "not reasonable to believe that they'll be leaving there any time soon." Despite this prognostication, his opinion that there would be inadequate parking, (1999 Dep. p. 53), and the indication on his own list of proposed sites that there was a long term lease and that the owner would not lease to an adult entertainment,[18] it appears that an adult use opened on the premises that very year.[19]

---

[17]Although Plaintiff sought to prove this was an illegal use which would be competing with TJS to relocate, it failed to meet its burden of proof on that claim.

[18]At his 2004 deposition, Mr. Cataldo was vague as to the basis for this claim. (Dep. pp. 121-122).

[19]Adult use was not indicated on Ex. S which was generated by Mr. Cataldo in April of 2000.

## Site 15 Ho-Jo Hotel

This site was an available alternative until 2000-2001 when The Scene, an adult use, opened. Presently, according to Mr. DeRubeis, much of the site is within five hundred (500) feet of The Scene. Although he testified that approximately one quarter (1/4) to one half (½) of an acre would not be within five hundred (500) feet of The Scene, he could not say whether actual construction on that section of the site would be feasible.

I find this site was available in 1994 and 1999.[20]

## Site 16 Strip Mall

This site presently contains an adult bookstore which opened in Smithtown after the enactment of the adult entertainment ordinance. Therefore, the site was available at the time of enactment of §322-30.2.

Subsequent to the opening of the bookstore, a children's day care center opened in the same mall. As a result the bookstore became a prior nonconforming use. Mr. DeRubeis testified that the day care center may be closing. However, the continued presence of the day care center would prevent TJS from moving there today. (Tr. 258). Nevertheless, this was a viable alternative in 1994. There was no testimony regarding the feasibility of an additional adult outlet on the site.

---

[20]In 2000 and 2004 Mr. Cataldo's objections to this site were inadequate parking and a "sewage flow" problem but he was unable to recall the basis for these objections. (2004 Dep. pp. 117-118; Ex. S).

### Site 17 Smithtown Ford

In Mr. Cataldo's Site Study of 2000, (Ex. S), he had no comment about this six and three-tenths (6.3) acre site. At trial he testified that the site was too large for his client, too expensive for his client and not pragmatic. (Tr. 683). Since the objections to this site do not render it unavailable under the Renton framework, the entire site is available for TJS. In any event, according to Mr. DeRubeis the site could be subdivided, the building could become multi-tenant or Plaintiff could use one side of the property if the present owner subdivided the property. (Tr. 271). In 1999, Mr. Cataldo testified that it was not reasonable to believe that the present tenant would sublet "for anything, let alone an adult use." (1999 Dep. p. 51).

This six and three-tenths (6.3) acre site is a suitable alternative.

### Site 18 Charmer Industries

Mr. Cataldo raised objections based upon his assessment that this five and six-tenths (5.6) acre site was sloped and therefore "environmentally sensitive" and too large and too expensive for his client's purposes. He also indicated that it was unlikely to become available. In 1999 Mr. Cataldo indicated at his deposition, (1999 Dep. p. 51), that the site was in contract for sale to General Motors and not suitable for a "small use." His Study comments of 2000 noted only the General Motors contract and that the back of the property contained a warehouse. However, his deposition of 2004 indicated that the site met all criteria, (2004 Dep. p. 160 line 20). Moreover, in his own application to the

Town on behalf of the owner, Mr. Cataldo did not mention concerns regarding the slope of the land his client sought to subdivide. (Tr. 837).

The Court adopts the finding of the Town's expert that the entire site, five and six-tenths (5.6) acres, is a reasonable alternative for TJS.

## Site 19 Saab

This site consists of four and eight-tenths (4.8) acres. In 1999 Mr. Cataldo indicated that this site should not be considered because it was unreasonable to believe that it would ever be anything but a car dealership. (Dep. p. 52). This was consistent with his testimony in 2004, (Dep. p. 161), and his own Study of 2000,[21] (Ex. S). This testimony does not state a basis for finding the site unavailable under Renton and its progeny. In any event, the site is already a multi-tenant site, with only eight percent (8%) of the existing building being utilized by the current car dealer owner. (Tr. 281, 530). Thus, TJS could relocate to a part of the site or purchase the entire site and utilize part or all of it.

This four and eight-tenths (4.8) acre site is a suitable alternative.

## Site 20 Wendy's

The site consists of two (2) lots which are available for TJS, according to Mr.

---

[21]Mr. Cataldo also indicated that a nearby Senior Citizen Center could be considered "a place of public assembly." (p. 162).

DeRubeis: a site of approximately one (1) acre currently occupied by a Wendy's restaurant and the lot behind it, also approximately one (1) acre. Mr. Cataldo indicated that this site would soon be occupied by a "Eastern Gym," which he characterized as a "place of public assembly." In his own list of alternative sites, Mr. Cataldo had no comment about this site.

The entire two (2) acre site is an available alternative site for TJS.

## Site 21 Former Pool Sales

Mr. Cataldo's objections to this ten (10) acre site at trial were based upon his continued mischaracterization of neighboring businesses as "places of similar public assembly." In his 1999 deposition he raised similar claims, (P. 54), but admitted that the site was otherwise a reasonable alternative location for adult entertainment use. His Study of Alternative sites noted only the size and price of the site. (Ex. S).

This ten (10) acre site is an available alternative for TJS.

## Site 22 Audi Parking Lot

At trial Mr. Cataldo's objections related to his incorrect assessment of neighboring uses as "places of similar public assembly" under the Smithtown Code. (Tr. 707). This was consistent with his 1999 assessment of this site. (1999 Dep. p. 56). In his 2000 study of alternative sites, (Ex. S), Mr. Cataldo noted only the "$3,250,000 Purchase Price" in the Comments section.

This entire five (5) acre site is found to be available for TJS.

### Site 23 Goodyear Tire

Mr. Cataldo did not study this site in 2000 and his only comment at trial was that it was near a McDonald's fast food restaurant. Although Mr. Cataldo raised an issue concerning the zoning classification of the site, which was not resolved, it concerned only the "back portion" of the site. (Tr. 710). In 1999 Mr. Cataldo indicated that this site was near "the Sports arena, Spaceplex." (1999 Dep. 56).

This one (1) acre site is a viable alternative site for TJS.

### Site 24 McDonald's

This two (2) acre site was vacant until approximately seven (7) years ago. (Tr. p.539). In 1999 Mr. Cataldo's only objection was the site's proximity to Spaceplex, which he characterized as "a place of similar public assembly." (1999 Dep. p. 56). When Mr. Cataldo examined this site in 2000 he indicated that there was an unwillingness on the part of the owner to "mix Sports Arena (children) with Adult Use." (Ex. S). At trial he indicated that he had been involved in securing this site for a client who intended to open facilities which, according to Mr. Cataldo, would involve children's activities. (Tr. 712). Nevertheless, even Mr. Cataldo conceded that one and one-half (1 ½) acres were available for TJS.

I find that this entire two (2) acre site is available for TJS as a reasonable alternative site.

## Site 25 Mercedes Benz

According to Mr. DeRubeis, this six (6) acre site consists of two (2) lots, either of which would be appropriate for TJS. One lot is vacant. The other contains a building which could be utilized as a multi-tenant property if TJS purchased or leased the entire site. At trial Mr. Cataldo's only objections related to his incorrect characterization of neighboring businesses as "places of similar public assembly." His 2000 study vaguely concluded that "These properties (large automobile dealerships) are not likely to be available for any other use in the foreseeable future." (Ex. S). In 1999, Mr. Cataldo indicated, (1999 Dep. p. 57), only that it was not reasonable to believe that Mercedes Benz would divide/sublet and that the site was otherwise appropriate.

This six (6) acre site is an available alternative for TJS.

## Site 26 Smithtown Mini Storage

This site is approximately six and one-half (6 ½ ) acres. At trial, Mr. Cataldo's objections were based upon the site's proximity to a McDonald's restaurant which had opened in approximately 2001, a developmental facility which had just opened and "Saf-T-Swim" which had not yet opened. At the time of his 2000 study, (Ex. S), Mr. Cataldo's only comment regarding this site was that it was then "under construction (self-storage)."

In 1999, (p. 58), Mr. Cataldo stated that "it's not reasonable to believe that they're going to allow any other business," (p. 57), and that the site was within five hundred (500) feet of Spaceplex.

I find the entire site to be a reasonable alternative site for TJS.

### Site 27 Former Mazda Dealer

According to Mr. DeRubeis this two and one-third (2 1/3) acre site is presently under construction for a "Smart Car" dealership. Although Mr. Cataldo testified at trial that the site was not an alternative because "It's an automobile dealership and it's not likely to turn over," his testimony was belied by the fact that the site had originally been a Mazda dealership, was a car rental agency in 2000, (Ex. S), and had "turned over" again to its present operation. Moreover, and although Mr. Cataldo indicated in 1999, (1999 Dep. p. 59), that there was insufficient parking, he conceded at trial that there was sufficient space to contain TJS and the requisite parking required for its use.

In his 2000 study, Mr. Cataldo's only comment concerning this site was "Auto Showroom Formally (sic) Mazda."

This two and one-third (2 1/3) acre site is a suitable alternative site.

### Site 28 Nissan Dealership

Mr. Cataldo objected to this four (4) lot site of two and one-third (2-1/3) acres based upon its proximity to a Wendy's restaurant and Eastern Gymnastics. (T. 723). He also indicated that, in his opinion, it was not likely to become available. This was his sole objection in 1999, (Dep. p. 59), 2000, (Ex. S), and 2004, (Dep. p. 125), although Eastern Gymnastics was in the same location in 1999 and 2000 and both Wendy's and Eastern

Gymnastics were on the site.

I find this site to be a reasonable alternative for TJS which could use the entire site, lease part of the site, and build an additional structure, if it so desired.

## Site 29 Land Rover

Mr. Cataldo cited that this one and one-half (1 ½ ) acre site is an automobile dealership within five hundred (500) feet of a residential district and a Wendy's restaurant as reasons that it should not be considered as a reasonable alternative for TJS. (Tr. 725) However, on cross-examination he conceded that he really did not know if it was currently operating as a car dealership. (Tr. 878).

Although he also testified that the present site configuration would create a "use behind a use", he conceded that this would not be a problem if his client utilized the entire site or subdivided it. (Tr 883). In 1999 Mr. Cataldo's sole objection to the site was that, as an automobile dealership it was not reasonable to believe that it could be subdivided for any other business. (1999 Dep. p. 61). He did not mention in 1999 or in 2000, (Ex. S), concerns about proximity to a residential district or a use behind a use.

This site is a reasonable alternative site for adult entertainment use.

## Site 30 Hummer

In 1999 Mr. Cataldo testified that this site met all criteria if it were to become vacant. He did not examine this site as part of his 2000 Study, (Ex. S). At trial he

indicated that the site was inappropriate because it was within five hundred (500) feet of a Wendy's restaurant and a residential district and because its present configuration would create a use behind a use. On cross examination he conceded that these objections were insubstantial. (Tr. 884-885). He also found the site to be too large for his client. (Tr. 727).

This site is a reasonable alternative site of approximately one (1) acre. (Tr. 366).

## Site 31 Competition BMW Parking Lot

This site is approximately two (2) acres. Mr. DeRubeis testified that approximately one (1) acre is available as an alternative site for adult entertainment use. (Tr. 377). Following his trial testimony regarding proximity to a fast food restaurant and his oft used dismissal of any site utilized as an automobile dealership, (Ex. S.), Mr. Cataldo conceded that even subtracting footage based upon his objections, his client would still have one (1) acre on which to relocate.

This site is a reasonable alternative site for TJS.

## Site 32 BMW

According to Mr. DeRubeis, this is a site of two and eight-tenths (2.8) of an acre, of which half is available as an alternative site for adult entertainment use. The site presently contains a building which Plaintiff could partition or raze and rebuild. In 1999 Mr. Cataldo testified that the site met all relevant criteria. (1999 Dep. p. 61). At trial he

conceded that one and one-half (1 ½) acres was available for his client's purposes. (Tr. 895).

This is a one and one-half (1 ½) acre site for TJS.

## Site 33 Smithhaven Mall

This site, which straddles the Towns of Smithtown and Brookhaven, contains forty-five (45) acres within the Town of Smithtown. According to Mr. DeRubeis, twenty (20) acres are available as an alternative site for adult entertainment use. (Tr. 385-389). Some of this acreage is in four (4) freestanding buildings outside the large mall structure. In 1999 and in his 2000 Study, (Ex. S), Mr. Cataldo disqualified the entire site as being across the street from a residential district. At trial he admitted, despite his belief that the mall was "a gathering place" for children, that fourteen (14) acres was viable for adult entertainment. ( Tr.743 989).

Twenty (20) acres is available as an alternative site for TJS.

## Site 34  Price Club Levitz Furniture

Mr. Cataldo did not consider this site in his 2000 Study, (Ex. S). The Levitz site is five and four-fifths (5 4/5) acres, (Tr. 406), of which approximately one-half (½) is within five hundred (500) feet of a residence zone. Although Mr. Cataldo noted proximity to the Smithhaven Mall, a nearby residential zone and slopes on the site, (Tr. 748-749), after intensive cross-examination he admitted that his client could relocate to a site slightly

larger than its present quarters. (Tr. 914). He also conceded that the Response he drafted the month before trial did not raise objections based upon slopes or proximity to the mall.

This site has two and nine-tenths (2.9) acres for relocation.

## Site 35 King O'Rourke Cadillac

This is a two and one-half (2 ½) acre site. At trial Mr. Cataldo sought to disqualify a portion of the site as proximate to a funeral parlor, another use which, in his mind, was a place of assembly which made it inappropriate for adult entertainment use. Apparently this was a new concern for Mr. Cataldo, who did not raise the funeral parlor at any prior time and, indeed, listed the property as a "potential"site in his Response one (1) month earlier.

Despite counsel's efforts to have Mr. DeRubeis define the funeral chapel as a church,[22] (Tr. 426-429), two and one-half (21/2) acres are available as an alternative site for TJS. (Tr. 423).

### D.    Additional Sites

In addition to the thirty-five (35) sites proposed by the Town, Mr. Cataldo examined additional sites. However, and as if setting up strawmen, Mr. Cataldo then found each of the sites to be disqualified. In some instances, he immediately disqualified sites for reasons he could not substantiate; in others, he actually inquired of property

---

[22]The Smithtown Zoning Code distinguishes between these uses.

-40-

owners as to availability but never followed up; others were disqualified by Mr. Cataldo for reasons which do not disqualify them as alternative sites under Renton. (2004 Dep. pp. 117-120). Some of the sites were found by the Town to be qualified as alternatives.

For example, Tax Map Number 800-180-01-50 was disqualified by Mr. Cataldo because "[a]pparently there was an insurance company occupying the building." (2004 Dep. p. 116); (Ex.S "Occupancy eminent (sic) as insurance company."). However, Mr. Cataldo could not recall whether he had ever contacted the owner. (2004 Dep. P.117). Nor could he recall how he had concluded that tax map number 800-114-04-19 had inadequate parking. (2004 Dep. p.170). Tax Map number 800-108-02-2.2 was disqualified because "[i]t was owned by New York State." (2004 Dep. p. 163).

He also listed eight (8) sites without tax map designations, (Ex. S 13-19; 21, 22), and disqualified each in the Comments column as "Within 500ft (sic) of Residence District" but could not explain how he had arrived at those conclusions. (2004 Dep. pp. 126-138; 168-169).

As to sites 800-108-05-po 01; 800-110-05-4 and 800-110-05-5, Mr. Cataldo's 2000 Study indicated that he was "Awaiting response" following inquiries to the owners of the sites. However, in 2004 he was unable to state what, if any, responses had been received. (2004 Dep. pp. 142-146).

IV.   CONCLUSION

The evidence at trial established a minimum of more than one hundred and forty-

-41-

five (145.59) acres available as alternative locations for TJS. This figure does not take into account sites for which no testimony of acreage was provided (i.e., sites 9, 14, 15, and 16). Nor does it consider the additional sites "studied" by Mr. Cataldo, (Ex. S), but not proposed by the Town. Even without those figures, however, the Town has demonstrated sufficient alternative acreage.

Based upon the Town's total commercial acreage of approximately three thousand one hundred eighty (3180) acres (thirty-one thousand eight hundred [31,800] total acreage multiplied by [x] ten percent [10%]), (Tr. pp. 495-496), more than four and a half percent ( 4.5%) of the commercial acreage, more than the percentage deemed sufficient in MJ Entertainment, 328 F.Supp.2d 480, was clearly available for adult entertainment in 1994 and 1999. Taking into account the acreage of sites which were not specifically quantified at trial would bring the figure much closer to, if not over, Renton's five percent (5%). Thus, the Town has met its burden of providing sufficient alternative avenues of communication and §322-30.2 is constitutional on its face and as applied.

For the reasons stated above, plaintiff's request for a declaratory judgment and for injunctive relief is denied. The clerk of the Court shall enter judgment in favor of defendant and close this case.

SO ORDERED.

Sandra J. Feuerstein
United States District Judge

Dated: May 13, 2008
Central Islip, New York